**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| REBECCA JANKOWSKI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-770 |
| | ) | |
| SAGE CORPORATION, | ) | Judge Joy Flowers Conti |
| | ) | Magistrate Judge Cathy Bissoon |
| Defendant. | ) | |
| | ) | |

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

**I.      RECOMMENDATION**

It is respectfully recommended that Defendant's Motion for Summary Judgment

(Doc. 26) be granted in part and denied in part, as discussed below.

**II.      REPORT**

**BACKGROUND**

Plaintiff, Rebecca Jankowski, commenced this Title VII action against her former

employer, Sage Corporation ("Defendant" or "Sage").  Plaintiff alleges a hostile work

environment on the basis of her gender in violation of Title VII.  She additionally alleges that

Sage violated Title VII by terminating her on the basis of her gender and in retaliation for

complaining about the harassment she allegedly experienced.

Plaintiff began working for Sage in October, 2001 as a Banquet Server.  See Def's

Statement of Material Facts (Doc. 26) ("Def's Facts") at ¶ 2; Pl's Response to Def's Facts ("Pl's

Facts") (Doc. 32) at ¶ 2.  She continued to work in this position until she was terminated on

February 13, 2006.  (Def's Facts at ¶ 2.)  During the relevant period, Plaintiff was supervised by

E'Rhonda DiPippo, Sage's Assistant Banquet Manager.  (Def's Facts at ¶¶ 28, 31.)

Ms. DiPippo, in turn, was supervised during the relevant period by Shahid Mian, Sage's Banquet Manager.  (Deposition of E'Rhonda DiPippo (Def. Ex. S (Doc. 26) & Pl. Ex. 3 (Doc. 32)) ("DiPippo Dep.") at 11, 14, 18.)

    Plaintiff's Allegations of Sexual Harassment and Defendant's Investigation

    Plaintiff alleges that she was sexually harassed by Shahid Mian, Sage's Banquet Manager.  Plaintiff asserts that Mr. Mian inappropriately touched her shoulders and lower back. (Deposition of R. Jankowski (Def. Ex. A (Doc. 26) & Pl. Ex. 1 (Doc. 32)) ("Jankowski Dep.") at 46.)  Specifically, she testified that Mr. Mian "had come over and started, like, rubbing my shoulders and patting my back and going down it."  (Jankowski Dep. at 46.)  Plaintiff also testified that Mr. Mian would "brush against [her]," or "brush up on [her] and walk his way."  Id. at 52-53.  Plaintiff testified that Mr. Mian rubbed her shoulders on a total of two occasions and brushed up against her "[p]robably four" times.  Id. at 53; see also Def's Facts at ¶ 58.  Plaintiff also asserts that she had one conversation with Mr. Mian that she believed was inappropriate during which he spoke "about his sexual life and how he said what he said to me."  (Jankowski Dep. at 60-61.)  She testified Mr. Mian told her "about his marriage and about his wife and how she couldn't satisfy him in bed.  He was like, 'I bet, being as beautiful as you are, you could do that for me.'"  Id. at 50-51.

    Plaintiff submitted a written statement to Sage on or about December 14, 2005, to complain about Mr. Mian.  (Def's Fact at ¶ 61; Def. Ex. O.)  In that statement, Plaintiff asserted that she had been having a problem with Mr. Mian "for the last two months."  (Def. Ex. O.) Specifically, she stated that Mr. Mian "is always around me[,] touching me and making me feel really uncomfortable."  Id.  She specified that Mr. Mian had been "[r]ubbing [her] shoulders,

putting his arm around [her]."  Id.  Plaintiff added that Mr. Mian "is also making remarks to me always saying you are beautiful."  Id.

After receiving Plaintiff's December 14, 2005 written statement regarding Mr. Mian, Sage investigated Plaintiff's claims.  (Def's Fact at ¶ 79.)  Specifically, Heather Ann Urban, Sage's Human Resources Director, spoke with Plaintiff, Ms. DiPippo, and Mr. Mian.  (Def's Facts at ¶¶ 80-82.)  Mr. Mian denied harassing Plaintiff or touching Plaintiff in an inappropriate manner.  Id. at ¶ 82.  Based on its investigation, Sage was unable to corroborate Plaintiff's allegations.  Id. at ¶ 83.  Ms. Urban subsequently discussed Sage's policy on harassment with Mr. Mian and advised him that such behavior would not be tolerated.  Id. at ¶ 84.  She also advised Plaintiff to contact her if she experienced any other issues with Mr. Mian.  Id. at ¶ 85.

Plaintiff's Work Performance at Sage

Sage provides to its employees both an Associate Conduct Policy and an Associate Handbook.  The Associate Handbook contains a provision regarding attendance and punctuality, which provides that "[p]unctuality and good attendance are essential for the effective operation of the hotel. . . . Absenteeism or tardiness that is excessive in the judgment of Sage Hospitality Resources will not be tolerated."  (Def's Facts at ¶ 10; Def. Ex. J at 15.)  The Handbook additionally provides that employees are to "comply with Sage's expectations for work, performance and conduct" and that failure to so comply "may result in any or all of the following actions, as Sage deems appropriate:  counseling, reprimand, written warning, and termination." (Def's Fact at ¶ 13; Def. Ex. J at 17.)  Finally, the Associate Conduct Policy provides that certain acts "may be considered reason for remedial actions which could range from oral or written reprimand to suspension from work without pay to dismissal."  (Def's Facts at ¶ 14; Def. Ex. L.) These acts include, but are not limited to, insubordination; unexcused or excessive absences or

tardiness; failing to notify a supervisor when unable to report to work as scheduled; and dining or snacking at times other than designated meal periods.  (Def's Fact at ¶ 14; Def. Ex. L.)  Prior to her termination from employment, Plaintiff received a total of seven written warnings for violating Sage's policies.  (Def's Facts at ¶ 18; Def. Exs. C-I.)  Four of these warnings were issued to Plaintiff in a 12-month period towards the beginning of her employment, while the remaining three were issued in January, 2006, just before her termination.  (Def's Facts at ¶¶ 24-38; Def Exs. C-I.)

<u>Discipline Issued In 2002-2003</u>

Between December, 2002 and December, 2003, Plaintiff received a total of four warnings primarily related to attendance and punctuality.  (Def's Facts at ¶¶ 19-23.)  Specifically, on December 31, 2002, Plaintiff received a warning for an unacceptable call-off from work.  (Def's Fact at ¶ 19; Def. Ex. C.)  On April 17, 2003, Plaintiff received another warning for failing to report for her shift on time.  (Def's Facts at ¶ 21; Def. Ex. D.)  On May 24, 2003, and again, on December 9, 2003, Plaintiff received warnings for failing to follow proper call off procedures.  (Def's Facts at ¶¶ 22, 23; Def. Exs. E, F.)  Also on December 9, 2003, Plaintiff received a warning for the improper use of an employee discount.  (Def's Facts at ¶ 23; Def. Ex. F.)

<u>Discipline Issued in 2006</u>

Plaintiff was not disciplined again until January, 2006.  On January 6, 2006, Plaintiff received a warning for insubordination, and more specifically, for using a public restroom during a banquet event, failing to perform her duty to pass appetizers, failing to be present at her assigned function during her entire shift, and for eating at the end of a shift as the event

concluded.  (Def's Facts at ¶¶ 24-26; Def. Ex. G ("January 6 Warning")[1].)  On January 13, 2006, Plaintiff again was disciplined for insubordination and for using profanity to her supervisor. (Def's Facts at ¶ 30; Def. Exs. H ("January 13 Warning").)  During this incident, Plaintiff erroneously believed that she was scheduled to work and, upon learning that she was not so scheduled, became upset and used profanity with her supervisor.  (Def. Ex. H.)  On January 31, 2006, Plaintiff received another written warning for failing to appear to work or report her absence from work.  (Def's Facts at ¶ 36; Def. Ex. I ("January 31 Warning").)  Plaintiff claimed that she was unaware that she was scheduled to work.  (Def. Ex. I.)

On February 7, 2006, Plaintiff arrived to work over two hours late.  (Def's Facts at ¶ 39.) Plaintiff contacted her supervisor to explain that she would be late because of traffic tie-ups due to a victory parade for the Pittsburgh Steelers.  (Deposition of Heather Ann Urban (Def. Ex. K (Doc. 26) & Pl. Ex. 4 (Doc. 32)) ("Urban Dep.") at 103-05.)  Sage subsequently terminated Plaintiff's employment on February 16, 2006 because of the "culmination of the . . . performance issues and disciplinary actions, as well as the amount of documentation for tardiness/absenteeism issues in Plaintiff's file."  (Def's Facts at ¶¶ 40-41.)

## ANALYSIS

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

---

[1]     Although the conduct for which Plaintiff was disciplined occurred on January 6, 2006, and the written warning is dated January 6, the warning actually was issued to Plaintiff on January 13, 2006.  (Def. Facts at ¶ 27; Def. Ex. G.)

A.      **Retaliation Claim**

In Count II of her Complaint, Plaintiff alleges that she was terminated because she engaged in activity protected by Title VII, namely that she complained that she believed she was the victim of sexual harassment.  Defendant argues that summary judgment should be granted in its favor on Plaintiff's claim for retaliation under Title VII.  The Court finds that genuine issues of material fact exist as to this claim and, therefore, recommends that summary judgment be denied on Count II.

Title VII makes it unlawful for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."  42 U.S.C. § 2000e-3(a).  A Title VII retaliation claim is analyzed under the familiar McDonnell-Douglas burden-shifting framework.[2] Thus, Plaintiff must first establish a prima facie case of retaliation.  To do so, Plaintiff must establish by a preponderance of the evidence that:  "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action."  Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000).  If Plaintiff establishes a prima facie case, the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for Plaintiff's termination.  Once Defendant articulates this reason, Plaintiff must proffer some evidence of pretext that would allow a fact-finder to disbelieve the reason and believe that retaliation was the real reason for the termination.  Krouse v. American Sterilizer Co., 126 F.3d 494, 501 (3d Cir. 1997).

---

[2]      The PHRA generally is interpreted in accordance with its federal counterparts.  See Kelly v. Drexel Univ., 94 F.3d 102, 104 (3d Cir. 1996).  Accordingly, the Court's decision relative to Plaintiff's Title VII retaliation claim applies equally to Plaintiff's PHRA retaliation claim.

Defendant argues that Plaintiff can neither establish a prima facie case of retaliation nor demonstrate that the reason for her termination – excessive documentation or, stated differently, a "culmination of disciplinary violations by Plaintiff" – was pretextual. As to the prima facie case, Defendant concedes that Plaintiff can satisfy the first two elements, but argues that she cannot establish the requisite causal connection. (Def's Mem. of Law in Support (Doc. 26) ("Def's Br.") at 12-13.) The Court concludes that Plaintiff has proffered sufficient evidence to create a genuine issue of material fact on the issue of causation as well as pretext.

The Court of Appeals for the Third Circuit has stated that a "plaintiff may rely upon a broad array of evidence to" establish the requisite causal connection. Farrell, 206 F.3d at 283. In assessing whether a causal connection has been established, the "record as a whole" must be evaluated to determine whether evidence exists from which the requisite causal link may be inferred. Id. at 281. Among the kind of evidence that may be probative of the issue are the timing between the protected activity and the adverse employment action, evidence of antagonistic conduct or animus, and inconsistencies in the reasons for the termination. Id. Ultimately, the task is to assess whether "the proffered evidence, looked at as a whole, may suffice to raise the inference" of a causal connection. Kachmar v. SunGuard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1997).

The Court has reviewed the record as a whole and finds that it contains sufficient evidence for a reasonable jury to conclude that a causal connection existed between the protected activity and the adverse employment action. As an initial matter, the Court notes that two months elapsed between Plaintiff's harassment complaint in December, 2005 and her termination in February, 2006. This timing, though not dispositve, is probative on the issue of causation when considered along with the other record evidence. Shellenberger v. Summit Bancorp, Inc.,

318 F.3d 183, 189 (3d Cir. 2003) (stating that "[t]he amount of time between the protected activity and the alleged retaliation is a circumstance to be considered by a fact-finder in determining if the plaintiff has established the required causation").

In addition, the sheer timing of the disciplinary warnings Plaintiff received in the weeks leading up to her termination is probative of the issue insofar as it demonstrates a pattern of antagonism or animus towards Plaintiff.  Farrell, 206 F.3d at 281; see also Woodson v. Scott Paper Co., 109 F.3d 913, 920-21 (3d Cir. 1997) ("a plaintiff can establish a link between his protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period").  In the two months between Plaintiff's complaint and termination, Defendant issued to Plaintiff three written warnings within thirty days of one another.  The repeated discipline in January of 2006, is particularly probative here in light of the fact that Plaintiff had not been disciplined in any way in the two-year period preceding her harassment complaint.

Although in its Motion, Defendant maintains that Plaintiff had been issued disciplinary warnings four previous times, the Court notes that these warnings were issued to her towards the beginning of her employment.  In fact, the record evidence raises a factual issue as to what extent the earlier warnings impacted or should have impacted (if at all) Defendant's decision to terminate Plaintiff for "excessive documentation."  Specifically, the record evidence reveals that, at the time Plaintiff was terminated, Defendant's policy was to not consider discipline "past 12 months."  (Urban Dep. at 93.)  Ms. Urban's testimony suggests that the four earlier warnings ought to have been irrelevant in the termination decision.  In fact, Ms. Urban testified that Plaintiff "was terminated for having four pieces of documentation in her file for excessive documentation" and that the four pieces consisted of the three written warnings in January, 2006

and the tardiness on February 7. Id. at 70-71. Ms. Urban further testified that four was not a "magic number," but that "it's, kind of, a standard that we go by, unwritten standard, so to speak." Id. at 94. The fact that Defendant chose not to terminate Plaintiff for "excessive documentation" or a "culmination" of disciplinary violations in 2003 when Plaintiff had accumulated the "unwritten standard" of four pieces of documentation, but chose to do so in 2006 – which, of course, post-dates Plaintiff's harassment complaint – certainly can be relied upon by Plaintiff to demonstrate a causal connection between Plaintiff's complaint of harassment and her ultimate discharge.

Moreover, the Court finds that a factual issue exists as to the extent to which Plaintiff's alleged harasser – Mr. Mian – was involved in issuing the three written disciplinary warnings in January of 2006, that form the basis for Defendant's termination decision.[3] To the extent that Mr. Mian played a role in the written disciplinary warnings that ultimately led to the termination decision, a reasonable jury could conclude that he harbored an antagonistic attitude towards Plaintiff and that the discipline was issued because of Plaintiff's harassment complaint.

Specifically, the record evidence demonstrates that Mr. Mian may have influenced each of the warnings issued to Plaintiff in this critical period that served as the basis for Defendant's termination decision. The record reveals that Ms. DiPippo, Plaintiff's supervisor, reported to Mr. Mian and testified that she talked to him about disciplinary write-ups. (DiPippo Dep. at 11, 43) (testifying that Mr. Mian was her boss and that she "talked to Shahid. I always had to talk to him, you know, when anything happened. I always had to bring it to his attention. That's just

---

[3]     In this regard, the Court acknowledges that Defendant asserts that Ms. Urban solely made the actual decision to terminate Plaintiff (Def. Facts at ¶¶ 53-54) and that Plaintiff does not dispute this assertion. (Pl's Response to Def's Facts at ¶¶ 53-54.) However, insofar as Defendant asserts that the culmination of discipline in Plaintiff's file led to Ms. Urban's decision to terminate, a fact-finder may consider the facts giving rise to the termination, including the persons involved in issuing the underlying discipline leading to the termination.

the way it is.")  With respect to the January 6, 2006 warning, although Mr. Mian did not ask her

to issue the warning, Ms. DiPippo testified as follows:  "After I brought it to his attention, he

said that would be the thing to do.  And so I listened to him, and I did.  But, you know, it would

have had to be done.  I mean, it has to be done, but he should have did it."  (DiPippo Dep. at 41-

42.)  To further evidence the influence Mr. Mian wielded, when asked whether she would have

issued Plaintiff this warning "whether or not Shahid told [her] to do it or not," Ms. DiPippo

testified she would not have issued it "[b]ecause it's just not my way of dealing with things. . . . I

don't feel like everybody should be written up for things."  Id. at 42.[4]

Ms. DiPippo similarly discussed the January 13, 2006 warning for failing to show for

work with Mr. Mian **before** she issued it to Plaintiff.  Id. at 47.  She testified that she did so to

confirm whether Plaintiff was scheduled because Mr. Mian had a "tendency of telling people to

come in and they weren't scheduled."  Id.  She added that Mr. Mian is "one to cover his tracks"

and that after she asked him, "he just looked with a little smirk and he's like, no."  Id.[5]

The final written warning before Plaintiff's termination for being late on February 7,

2006, appears to have been issued directly by Mr. Mian insofar as the form itself indicates that it

is "From:  Shahid Mian."  (Def. Ex. I.)  The record contains no evidence refuting this.  As for the

incident that finally led to Plaintiff's termination – her tardiness on February 7, 2006 – the record

---

[4]     The Court additionally notes that the record contains evidence to show that Plaintiff may have been
somewhat singled out for this particular incident.  Plaintiff argues that a fellow co-worker (her mother) was
not disciplined, despite engaging in the same conduct.  (Pl. Br. in Opp. to Def's Mot. (Doc. 33) ("Pl's
Opp.") at 10.)  Ms. DiPippo testified that management was "coming down hard on us to document things."
(DiPippo Dep. at 42-43.)  Yet she also admitted that Plaintiff's mother was not disciplined, despite having
been engaged in the very same conduct as Plaintiff and further admitted that she probably should have
issued a warning to Plaintiff's mother.  Id. at 40.  She further testified that she may not have written up
Plaintiff's mother because she "had more issues against [Plaintiff] at the time."  Id.  There is no evidence,
however, of what "more issues" Ms. DiPippo had against Plaintiff "at the time."  That Ms. DiPippo did not
issue such a warning, particularly in light of her testimony that there purportedly was an increased
emphasis on documenting misconduct, only adds to the factual issues pertaining to causation and pretext.
[5]     Ms. DiPippo also opined on Mr. Mian's "smirk," testifying that "he smirks just like when you put him on
the spot, and [he is] not a very honest person."  (DiPippo Dep. at 60-61.)  She added that she "could see
him, you know, probably scheduling [Plaintiff] and not telling.  He's done that to a few employees, and
they'll come in irate, . . . So he had a tendency of lying a lot."  Id.

reveals that Mr. Mian is the individual who brought Plaintiff's tardiness to Ms. Urban's attention. (Urban Dep. at 100, 104-05.) Notably, Mr. Mian did not report to Ms. Urban that another employee also was tardy on that date. Id. In addition, the evidence demonstrates that Plaintiff contacted Mr. Mian to inform him that she was running late. Id. at 104-05. The fact that Mr. Mian raised Plaintiff's tardiness despite her having contacted him about her tardiness and on a date when another employee also was late takes on added significance in light of Ms. Urban's testimony that Plaintiff would not have been terminated but for her tardiness on February 7. Id. at 70.

In light of this unrefuted evidence of Mr. Mian's involvement in the discipline issued to Plaintiff in 2006 that formed the basis for Defendant's termination decision, Defendant's assertion that the actual decision to terminate was made by Ms. Urban is less significant and somewhat immaterial for purposes of Plaintiff's retaliation claim. Because Defendant's articulated reason for Plaintiff's termination is a "culmination" of disciplinary warnings, or "excessive documentation" in Plaintiff's personnel file, Mr. Mian's involvement in issuing the very discipline that evidenced that "culmination" or "excessiveness" raises an inference that antagonism or a retaliatory motive may have been lurking in the background.

In addition to testifying about Mr. Mian's involvement with the disciplinary warnings, Ms. DiPippo also opined on the possibility that Mr. Mian was trying to "get rid of" Plaintiff:

> Q.    If Shahid was trying to get rid of [Plaintiff] because she complained about him, it's a possibility, isn't it?
>
> A.    It's definitely. He did it to me, so yeah.

(DiPippo Dep. at 61.) Viewing the above testimony and other evidence in the light most favorable to Plaintiff, the Court finds that there is an issue of fact as to whether Plaintiff's harassment complaint caused her discipline and ultimate termination.

- 11 -

Additionally, Plaintiff has satisfied her burden of demonstrating evidence of pretext.  At this stage, the burden of production shifts to Defendant to articulate a legitimate, non-discriminatory business reason for its decision to terminate Plaintiff's employment.  As previously noted, Defendant maintains that Plaintiff was terminated because of "a culmination of disciplinary violation" or "the amount of documentation for tardiness/absenteeism issues in Plaintiff's file."  (Def's Br. at 9; Def's Facts at ¶ 41.)  Plaintiff does not challenge whether Defendant has satisfied its burden at this stage and therefore, the Court concludes that Defendant has met its burden of articulating a legitimate business reason for the termination.  The burden, however, now shifts back to Plaintiff to discredit the reason articulated and demonstrate that a retaliatory animus motivated Defendant.  Krouse, 126 F.3d at 501.

The very same evidence discussed above with regard to the issue of causation also supports Plaintiff's theory of pretext, including the sudden flurry of discipline Plaintiff received after a two-year period with zero discipline; the timing and circumstances surrounding the discipline, including Mr. Mian's involvement in the very discipline that underlies and justifies Defendant's termination decision; and the temporal proximity of the termination decision to Plaintiff's harassment complaint.  Farrell, 206 F.3d at 286 ("As our cases have recognized, almost in passing, evidence supporting the prima facie case is often helpful in the pretext stage and nothing about the McDonnell Douglas formula requires us to ration the evidence between one stage or the other.") (citing cases).

The Court finds that, based on the evidence above, a reasonable jury could find that Defendant's articulated reasons for terminating Plaintiff was false and that unlawful retaliation was the real reason for Plaintiff's termination.  Accordingly, the Court recommends that

Defendant's Motion for Summary Judgment be denied with respect to Plaintiff's claim for retaliation in Count II.

    **B.**    <u>**Harassment Claim**</u>

       Defendant argues that summary judgment should be granted in its favor on Count III of Plaintiff's Complaint for hostile work environment.

       To establish a hostile work environment claim under Title VII, a plaintiff must demonstrate the following:  "(1) that she suffered intentional discrimination because of her sex; (2) that the discrimination was severe or pervasive; (3) that the discrimination detrimentally affected her; (4) that the discrimination would detrimentally affect a reasonable person in like circumstances, and (5) that a basis for employer liability is present."  <u>Theriault v. Dollar General</u>, 336 Fed. Appx. 172, 174 (3d Cir. 2009); <u>see also</u> <u>Jensen v. Potter</u>, 435 F.3d 444, 449 (3d Cir. 2006) (citations and footnotes omitted), <u>overruled in part on other grounds</u> by <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53 (2006).  Defendant primarily argues that Plaintiff cannot establish that the alleged harassment was "severe or pervasive."

       To determine whether the conduct is sufficiently severe or pervasive, the Court must evaluate "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance.'"  <u>Theriault</u>, 336 Fed. Appx. at 174 (quoting <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 787-88 (1998)).  The harassment "'must be so severe or pervasive that it alters the conditions of the victim's employment and creates an abusive environment.'"  <u>Carratini v. Woods Svcs., Inc.</u>, --- F. Supp. 2d ---, No. 08-5201, 2010 WL 447453, at *3 (E.D. Pa. Feb. 4, 2010) (quoting <u>Weston v. Pennsylvania</u>, 251 F.3d 420, 426 (3d Cir. 2001)).  Moreover, "[i]solated or sporadic incidents, unless extremely serious, and offhand comments are not sufficient to state a claim."  <u>Id.</u> (citing <u>Carver v. City of Trenton</u>, 420 F.3d

243, 262 (3d Cir. 2005).  The Court concludes that Plaintiff has failed to proffer sufficient evidence to establish that the alleged harassing conduct was severe or pervasive.

The evidence, viewed in the light most favorable to Plaintiff, reveals that Mr. Mian's harassment was limited to the following:  (i) two instances of Mr. Mian placing his hands on Plaintiff's shoulder and/or back and rubbing it; (ii) "probably" four instances of Mr. Mian "brush[ing] up on [her] and walk[ing] his way"; and (iii) a single conversation during which Mr. Mian commented on the intimacy of his marriage and perhaps implied that Plaintiff could satisfy him more than his wife.[6]  Although Mr. Mian's conduct may have been inappropriate and unprofessional, it is neither sufficiently severe nor pervasive to satisfy the second element of Plaintiff's prima facie case.  Shramban v. Aetna, 115 Fed. Appx. 578, 579-80 (3d Cir 2004) (affirming grant of summary judgment on grounds that conduct was not severe or pervasive where plaintiff's claim was premised on offensive comments and touching of plaintiff's hand on two occasions); Carattini, 2010 WL 447453, at *3-4 (granting summary judgment to defendant on hostile work environment claim premised on a single incident in a six-day period where co-worker "grabbed [plaintiff's] breasts and vagina" because the allegations were neither severe nor pervasive; court stated that "unwelcomed contact with [p]laintiff's vagina and breasts, albeit totally inappropriate, [does not] rise to the level of severity required to support a claim for hostile work environment") (citing several cases illustrating that far more offensive conduct was insufficient to rise to the requisite severity or pervasiveness); Lignore v. Hospital Univ. of Pennsylvania, No. 04-5735, 2006 WL 1804571, at *7-8 (E.D. Pa. June 28, 2006) (in a case of same sex harassment, granting summary judgment on harassment claim and stating that "[f]ocusing on the allegations of physical contact, while the alleged elbowing, 'brushing up' and

---

[6]     The Court notes that when Plaintiff submitted her written complaint to Defendant, she did not identify this, or any other, conversation in which Mr. Mian made sexual, or sexually suggestive, comments.  (Def. Ex. O.)

slipping of [harasser's] finger under [plaintiff's] bra strap could conceivably amount to annoying, overly familiar or informal, or even offensive behavior, 'more intimate or more crude physical acts – a hand on the thigh, a kiss on the lips, a pinch of the buttocks – may be considered insufficiently abusive to be described as 'severe' when they occur in isolation'") (quoting Hostetler v. Quality Dining, Inc., 218 F.3d 798, 808 (7th Cir. 2000) and citing other cases on severity and pervasiveness); Brown v. Sunoco Logistics Partners, L.P., No. 05-2262, 2006 WL 1308295, at *9-10 (E.D. Pa. May 10, 2006) (finding as insufficiently severe or pervasive conduct that consisted of, among other things, rubbing plaintiff's shoulder and patting her back, offhand comments, teasing and occasional abusive language); Saidu-Kamara v. Parkway Corp., 155 F. Supp.2d 436, 439-40 (E.D. Pa. 2001) (granting summary judgment on hostile work environment claim because conduct was not sufficiently severe or pervasive where alleged harassment consisted of asking plaintiff out on dates, sexual innuendo and a physical touching of plaintiff's breasts and buttocks).

Moreover, Plaintiff has not proffered any evidence to demonstrate how the conduct interfered with her work or otherwise affected her work performance.  Although Plaintiff testified that Mr. Mian altered her work schedule so that he could work with her more often, she has not proffered evidence to show how this detrimentally affected her.  Viewing the evidence in the light most favorable to Plaintiff, at most, Plaintiff felt "uncomfortable" around Mr. Mian. However, Title VII is not a "general civility code" and thus, Plaintiff's feelings of discomfort alone are insufficient to state a hostile work environment claim.  See Willauer v. Riley Sales, Inc., --- F. Supp. 2d ---, No. 08-5258, 2009 WL 2959822, at *5 (E.D. Pa. Sept. 16, 2009) (stating that the evidence suggested "an individual who is attracted to another individual and made modest overtures to that fact.  Such conduct is not sexual harassment merely because it occurs in,

around or after work and is undesired.  Title VII 'does not set forth 'a general civility code for

the American workplace.'") (quoting Burlington N. & Santa Fe. Ry. Co. v. White, 548 U.S. 53,

68 (2006)).

      In sum, based on the record evidence, Plaintiff cannot satisfy an element of her prima

facie case and, as such, has not demonstrated a genuine issue of material fact as to whether she

was subjected to a sexually hostile work environment.  Accordingly, the Court recommends that

summary judgment be granted in favor of Defendant on Plaintiff's claim for hostile work

environment.

      **C.**     **Gender Discrimination Claim**

      In Count I of her Complaint, Plaintiff asserts that she was terminated from her

employment because of her gender in violation of Title VII.  Although Defendant sought

summary judgment on Count I, Plaintiff did not respond to Defendant's arguments in her

Opposition to Defendant's Motion or otherwise discuss (let alone mention) her gender

discrimination claim, much less raise any issues of fact as to why the claim should not be

dismissed on summary judgment.  See generally Pl's Opp.  Indeed, in her "Conclusion," Plaintiff

asserts only that "summary judgment is not proper in this case as genuine issues of material fact

exist within the province of a jury as to both plaintiff's claims of retaliation and a hostile work

environment," with notably no mention of her claim of gender discrimination.  (Pl's Opp. at 11.)

      Based on the above, Plaintiff's claim for gender discrimination is considered abandoned

and the Court need not reach the merits of this claim.  Reyes v. AutoZone, Inc., --- F. Supp. 2d --

---, No. 08-847, 2009 WL 4559454, at *12 (W.D. Pa. Dec. 2, 2009) (Mitchell, J.) (granting

summary judgment on several of plaintiff's claims because plaintiff "did not discuss [in his

opposition] the allegations in his complaint" concerning those claims and concluding that

"[t]hose claims are, therefore, considered abandoned"); Uhl v. County of Allegheny, No. 06-

01058, 2008 WL 2858412, at *9 (W.D. Pa. July 22, 2008) (Fischer, J.) (noting plaintiff's lack of response to defendant's motion and stating that "[p]laintiff appears to have abandoned his claim . . . and courts have granted summary judgment where a party fails to respond) (citing cases); <u>see also</u> <u>Rife v. Borough of Dauphin</u>, 647 F. Supp. 2d 431, 441-42 (M.D. Pa. 2009) ("even if [p]laintiff had meant to assert an discrimination claim in his Amended Complaint, his failure to brief this claim in opposition to summary judgment or otherwise come forward with evidence to support the claim constitutes a waiver of that claim entitling Defendants to summary judgment") (citing <u>National R.R. Passenger Corp. v. Pa. Public Utility Com'n</u>, 342 F.3d 242, 259 n.14 (3d Cir. 2003) and Fed. R. Civ. P. 56(e)(2) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in his own pleading")).  Accordingly, the Court recommends that Defendant's Motion be granted as to Count I of Plaintiff's Complaint and that Count I be dismissed with prejudice.

## CONCLUSION

For all of the reasons stated above, Defendant's Motion for Summary Judgment (Doc. 26) should be granted in part and denied in part.  Defendant's Motion should be granted as to Counts I and III of Plaintiff's Complaint for gender discrimination and hostile work environment, respectively.  Count I should be dismissed because Plaintiff has abandoned that claim.  Count III should be dismissed because Plaintiff has failed to demonstrate that the harassment was sufficiently severe or pervasive under Title VII.  Accordingly, it is respectfully recommended that the District Court enter summary judgment in favor of Defendant on Counts I and III of Plaintiff's Complaint.

Defendant's Motion for Summary Judgment as to Count II of Plaintiff's Complaint for retaliation should be denied.  The Court finds issues of material fact as to whether a causal connection exists between Plaintiff's protected conduct and her termination and as to whether

Defendant's reason for terminating Plaintiff, i.e., excessive documentation or a culmination of discipline, was pretext for retaliation.

In accordance with the Magistrates Act, 20 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Rules for Magistrates, objections to this Report and Recommendation are due by March 9, 2010.  Responses to objections are due by March 23, 2010.

s/ Cathy Bissoon
Cathy Bissoon
U.S. Magistrate Judge

February 23, 2010

cc (via email):

Gregory G. Paul, Esq.
Wayne E. Pinkstone, Esq.